**NOBELPHARMA U.S.A. INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 97–6.
Court No. 91–02–00097–S.

United States Court of
International Trade.

Jan. 13, 1997.

Wasserman, Schneider & Babb, New York City (Louis Schneider, Patrick C. Reed and David M. Steiner), for plaintiff.

Frank W. Hunger, Assistant Attorney General, Washington, D.C.; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, New York City (Mark S. Sochaczewsky, Edith Sanchez Shea and Barbara Silver Williams); and Office of Assistant Chief Counsel, U.S. Customs Service, New York City (Chi S. Choy), of counsel, for defendant.

AQUILINO, Judge:

The defendant has interposed a motion for summary judgment, dismissing this test case within the meaning of CIT Rule 84(b) on the alternative grounds of lack of subject-matter jurisdiction or correct classification by the U.S. Customs Service of the predicate merchandise under item 658.00 of the Tariff Schedules of the United States ("TSUS") ("Articles of base metals not provided for in the foregoing provisions of this subpart, not coated or plated with precious metal"), with duties assessed at a rate of 5.9 percent *ad valorem*. In its pleadings and own motion for summary judgment, the plaintiff prays

for reliquidation duty free under TSUS item 870.67 ("Articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons: ... Other") (1988).

## I.

■ Postdating the parties' cross-motions and pending before the court is plaintiff's motion to file a second amended complaint in which it "seeks to plead that its summons commencing this civil action under 28 U.S.C. § 1581(a) is or may be deemed timely filed on February 14, 1991." The latter motion is hereby granted, not only upon the response of the defendant, deferring to the court's discretion, but also in light of the following facts and circumstances: .

4. On or about November 22, 1989, and pursuant to section 1121(j)(2) of the Omnibus Trade and Competitiveness Act of 1988, plaintiff filed with ... Customs ... a timely submission ... in which [it] requested reliquidation of a number of its entries made between August 1985 and January 1989, including the entries involved in this civil action[,] ... to classify the imported merchandise retroactively in item 870.67, TSUS, and to refund all excess duties to plaintiff....

5. [ ] Customs ... assigned the number "0401–89–000860" to the November 1989 Submission and, shortly after receiving it, returned a copy ... to plaintiff's attorneys on which ... "Protest # 0401–89–000860" was written by the responsible ... official....

6. [ ] Customs ... denied the request for reliquidation set forth in the November 1989 Submission on or about August 13, 1990....

7. A copy of the denied November 1989 Submission ... was mailed to plaintiff's attorneys, with the following handwritten message ... appearing on [it]: "Protest Denied. Original decision reviewed an[d] found to be correct. Ref: CF6445." ...

8. [ ] Customs ... treated plaintiff's November 1989 Submission ... as a pro-

test in all respects, and processed, reviewed, and denied it under the procedures used for protests filed on [C]ustoms [F]orm CF19....

9. On or about September 20, 1990, plaintiff attempted to file a protest (the "September 20th protest") with [ ] Customs ..., protesting the denial of the request for reliquidation set forth in [the] November 1989 Submission.... The September 20th protest was designated number 0401–90–000897....

10.... Customs ... returned the September 20th protest ... to plaintiff's attorneys, accompanied by a cover slip which contained the following handwritten message ...: "Rejected—protest already denied based on facts presented. No new issues ... presented." ...

11. Subsequently, at the insistence of plaintiff's attorneys, ... [C]ustoms agreed to process the September 20th protest....

12. On December 19, 1990, plaintiff filed ... a request for accelerated disposition of the September 20th protest ... pursuant to ... 19 U.S.C. § 1515(b)[ ].... Customs ... failed to act on the September 20th protest within 30 days after either the mailing or the ... receipt of plaintiff's request for accelerated disposition....

13. On February 5, 1991, plaintiff commenced ... Court Number 91–02–00097. Plaintiff's summons states that the civil action contests the denial of protest number 0401–90–000897, as well as the denial on August 13, 1990, of the November 1989 Submission (no. 0401–89–000860) requesting retroactive reliquidation. Plaintiff's summons was filed (a) more than 30 days after both the mailing and the ... Service's receipt of plaintiff's request for accelerated disposition of protest no. 0401–90–000897 and (b) within 180 days of the ... Service's denial of the November 1989 Submission (no. 0401–89–000860).... [1]

The defendant admits each of these paragraphs. *See* Defendant's Response to Plaintiff's Statement of Material Facts as to

---

1. Statement of Uncontested Material Facts in Support of Plaintiff's Motion for Summary Judgment, paras. 4–13. For ease of reading, the court has omitted plaintiff's references in regard to each of these paragraphs, but it has reviewed and found them to be supportive.

Which There Is No Genuine Issue To Be Tried, pp. 1–2. It does not contest that the September 20th protest was filed in accordance with the requirements of 19 U.S.C. § 1514 (1988). *See* Defendant's Memorandum, p. 6, n. 5. Rather, it argues that plaintiff's

> request for accelerated disposition was void because it was prematurely mailed **on**, instead of **after**, the 90th day following the filing of the September 20th protest. *See* 19 U.S.C. § 1515(b) (1988). Accordingly, the September 20th protest was not denied until February 13, 1991. Thus, this Court lacks jurisdiction here, as Nobelpharma prematurely filed a summons on February 5, 1991, eight days **before** the September 20th protest was denied.

*Id.* at 5–6 (emphasis in original; footnote omitted). On the other hand, the defendant does note that,

> inasmuch as the protest filed by plaintiff was in fact denied on February 13, 1991, and that protest was apparently timely filed, the Court may, in its discretion, deem the action to have been timely filed on the day following that date.

*Id.* at 1, n. 1, citing *Wear Me Apparel Corp. v. United States,* 1 CIT 194, 511 F.Supp. 814 (1981).

In that case, the court recognized that the filing with and denial by Customs of a protest are prerequisites for the effective commencement of an action of the kind at bar but held in view of the denial of the protest that dismissal of the action

> would be an empty formalism because plaintiff could immediately after dismissal file a new action over which this court would unquestionably have jurisdiction under section 1581(a). However, ... plaintiff is directed to file ... an amended complaint with respect to those of its claims as to which a protest has been denied.

1 CIT at 197, 511 F.Supp. at 817. As indicated above, the plaintiff herein has followed this admonition, and this court has granted

its motion to file a second amended complaint—without opposition by the defendant.

■ As for plaintiff's earlier filing with the Service, the defendant recounts that the November 1989 submission "clearly and unambiguously states that § 1121(j) of the 1988 Act was the statutory basis for reliquidation; it does **not** state that it was filed pursuant to § 1514." Defendant's Memorandum, p. 14 (emphasis in original). And it argues that, even

> if the November 1989 Submission could be construed as a protest, it was not timely filed as to the entries at issue. To constitute a valid protest under § 1514, a request for reliquidation must be filed within 90 days after notice of liquidation.... The entries at issue in this action were liquidated on July 25, 1986, November 7, 1986, and January 30, 1987. Nobelpharma's November 1989 Submission requesting reliquidation was not made until **more than two years** after these entries were liquidated. Accordingly, ... it is not a valid § 1514 protest.

*Id.* at 17 (citations omitted; emphasis in original).

Subject-matter jurisdiction under 28 U.S.C. § 1581(a) is linked statutorily to 19 U.S.C. § 1515, which, in turn, refers to protests filed in accordance with section 1514. As the defendant indicates, subsection (c)(2) thereof calls for their filing within 90 days after but not before notice of liquidation or reliquidation. However, the cited section 1121(j)(2) of the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107, 1143, provided that, "[n]otwithstanding section 514 of the Tariff Act of 1930 or any other provision of law", a request for reliquidation could be filed for qualifying merchandise entered on or after August 12, 1985 up to 180 days after "the date that is 15 days after the deposit of the United States ratification of the Nairobi Protocol[²]", which occurred on May 15, 1989. *Cf.* Presidential Proclamation No. 5978, 54 Fed.Reg. 21,187 (May 17, 1989). Plaintiff's November 1989

---

**2.** This Protocol, which went into effect January 2, 1982, 1259 U.N.T.S. 2, broadened the scope of the Florence Agreement on the Importation of Educational, Scientific, and Cultural Materials,

*opened for signature* November 22, 1950, T.I.A.S. No. 6129, 17 U.S.T. 1835, 131 U.N.T.S. 25, by embracing technologically-new articles and previously-uncovered works of art, films etc.

submission to Customs was thus timely, which the Service admits. *See* Defendant's Memorandum, p. 3, n. 3.

> That submission requested the
> reliquidation of the entries listed on Schedules ... to [it] and the refund of all duties assessed on dental implants and related products and instruments for osseointegrated implant dentistry imported in these entries. These articles are specially designed for the use or benefit of handicapped persons. They are entitled to retroactive duty-free entry under the Nairobi Protocol and its implementing legislation, the Omnibus Trade and Competitiveness Act of 1988....

Affidavit of Patrick C. Reed, Exhibit A, p. 1. It set forth more than adequate information for the Service to discern the nature of the importer's position. *Cf. Mattel, Inc. v. United States*, 72 Cust.Ct. 257, 262, 377 F.Supp. 955, 960 (1974) ("however cryptic, inartistic, or poorly drawn a communication may be, it is sufficient as a protest for purposes of section 514 if it conveys enough information to apprise knowledgeable officials of the importer's intent and the relief sought"). Indeed, Customs treated plaintiff's submission as a protest, assigning a number and notating the copy returned "Protest Denied Original decision reviewed and found to be correct." Reed Affidavit, Exhibit C, second page. *See, e.g., Donjon Marine Co. v. United States*, 12 CIT 100 (1988) (correspondence with the Service attempting to have entry reliquidated effective when treated as a protest by Customs). *See also* Reed Affidavit, Exhibit D (September 20, 1990 protest "Rejected—protest already denied based on facts presented. No new issues ... presented").

In sum, the court concludes from the foregoing that its jurisdiction has been properly invoked by the plaintiff in this test case.

## II

The merchandise at issue is depicted and described in great detail in exhibits B, C and D to the declaration of Dr. David Schumann

in support of plaintiff's motion for summary judgment. The accompanying statement of material facts refers to these goods, in part, as follows:

> 14. The imported titanium implants and components and the surgical instruments are used in a specialized technique of reconstructive dental surgery known as osseointegrated implant dentistry. The surgical procedure was developed by Dr. Per–Ingvar Brånemark, a Swedish surgeon and researcher, and is commercially known as the Brånemark System® procedure....

> 15. Th[is] ... procedure ... allows the permanent replacement of teeth in selected patients suffering from the loss of the original teeth....

> 16. In the ... procedure, the titanium implants are surgically inserted into the patient's jawbone below the gum line. After the[y] ... are inserted, the bone tissue grows into the[ir] threads ..., uniting with the titanium and actually integrating the implant[s] into the tissue. The term "osseointegration" refers to this permanent incorporation of the titanium implant into the bone tissue. The osseointegrated implants serve as anchors for a dental prosthesis (i.e., a set of artificial teeth)....[3]

The defendant admits each of these representations. *See* Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried, p. 2. But it abides the classification by Customs under TSUS item 658.00, *supra*, which the plaintiff contests upon the following additional averments, among others, claiming they are material yet do not require trial:

> 17. Brånemark System® dental implants were designed for the treatment of patients who cannot use dentures satisfactorily....

> 18. The Brånemark System® procedure is intended for patients who suffer from a permanent physical impairment, namely, tooth loss....

---

**3.** As for paragraphs 4–13 of plaintiff's statement of facts, *supra*, the court has omitted for ease of reading these subsequent paragraphs the references given, but it has reviewed each and found them to be supportive.

19. The ... procedure is intended for patients who suffer from additional permanent physical or mental impairments, besides tooth loss, which prevent the[ir] ... functioning satisfactorily with removable dentures. These additional impairments can include damage to or deterioration of the bone in the jaws, or physical defects in the mouth or facial area caused by injuries, disease, and congenital conditions....

\* \* \*

21.... Tooth loss constitutes a serious handicap for many of these patients. If not satisfactorily resolved, it substantially impairs the[ir] ability to speak and chew food properly.... [I]t may give rise to severe psychological problems, constrain ... ability to engage in customary social functions, and seriously diminish the quality of life in general. Such patients are referred to in medical literature as "oral invalids." ...

\* \* \*

24. The imported titanium implants and components, as well as the imported surgical instruments, are specially designed, manufactured, and dedicated to use in the Brånemark System® procedure....

\* \* \*

26. The Brånemark System® ... implants and related components ... are articles for the use or benefit of persons suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life functions....

\* \* \*

28. The imported titanium implants and components are not dentures....

29. The[y] ... are not replicate teeth or replacements for the natural teeth. After osseointegration, the ... implants serve as anchors or supports embedded in the jawbone. Abutments are attached to the[m] below the gum line and come through the gum. A prosthesis consisting of a framework of artificial teeth is attached to the abutments....

\* \* \*

31. The imported titanium implants, as well as the imported surgical instruments, are not cosmetic articles. This is because they compensate for the patients' inability to function and enable patients who would otherwise be "oral invalids" to speak, chew, and digest food normally, and to resume normal lifestyles....

32. The[y] ... are not therapeutic articles because they do not treat the underlying conditions that cause tooth loss and do not restore the patients' natural teeth. Rather, ... the [Brånemark] System® procedure compensates for, and help[s] the patient adapt to, the handicapped condition.... [4]

The defendant admits paragraph 18. *See id.* It responds to the others, in the main, as follows:

19.... [W]hile some patients may have other physical or mental impairments, such impairments are not prerequisite to the use of the subject merchandise. Some physical or mental impairments may actually prevent the use of the subject merchandise....

\* \* \*

21.... Patients who undergo osseointegration implants need not suffer from severe physical impairment. It is more likely that they are not at all impaired, so that they can endure the long term treatment required by osseointegration implant.

\* \* \*

24.... It is possible that the instruments may also be used in other applications, such as for periodontal or endodontal work.[ [5] ]

\* \* \*

28.... The imported titanium implants and components are dentures as they are artificial teeth or parts of artificial teeth.

29.... We agree that the implants have the general appearance of small

---

**4.** *See id.*

**5.** The defendant repeats this verbatim in response to plaintiff's paragraph 26.

screws, and that after osseointegration, the[y] serve as anchors or supports embedded in the jawbone. Abutments are attached to the implants below the gum line and come through the gum. Nevertheless, the implants are replicate teeth or replacements for the natural teeth as they serve the same function as the roots of natural teeth. The visible part of artificial teeth is merely the portion known as the crown. . . .

\* \* \*

31. . . . While the titanium implants are not purely cosmetic articles, they do have a cosmetic function. . . .

32. . . . There are many causes for the loss of the natural teeth, such as bad oral hygiene, trauma, and periodontal disease. The subject merchandise is a cure for all these causes as it provides a permanent replacement for the tooth that is missing.

*Id.,* pp. 2–5. While the word "Denies" precedes each of these representations by the defendant, it also annotates each with a statement that its position "does not give rise to a genuine issue of material fact to be tried." *See id.,* pp. 2–5, notes 1, 2, 4, 7, 9–11, 13, 14. *See also* Defendant's Reply, pp. 5–6, note \*.

After review of all the evidence submitted, the court concurs that trial is not necessary. Any disagreements can be resolved via the cross-motions for summary judgment[6], which posit dispositive substantive issues that are essentially legal in nature.

## A

Congress enacted the Educational, Scientific, and Cultural Materials Importation Act of 1982, Pub.L. No. 97–446, Title I, Subtitle B, § 161(b), 96 Stat. 2329, 2346 (1983), to "enable the United States to give effect to the Nairobi Protocol to the Florence Agree-

ment on the Importation of Educational, Scientific, and Cultural Materials". Section 165 of that subtitle eliminated duties on articles specially designed or adapted for the use or benefit of the blind or other physically or mentally handicapped persons by amending Part 7 of TSUS Schedule 8. In 1988, Congress passed the Omnibus Trade and Competitiveness Act, section 1121 of which further provided for implementation of the Nairobi Protocol, among other things, by repealing the 1982 act but by including the same provisions of that statute in Part 7 of TSUS Schedule 8, numbered as items 870.65, 870.66 and 870.67[7], conditioned upon the following headnote:

(a) For purposes of [these] items . . ., the term "blind or other physically or mentally handicapped persons" includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(b) Items 870.65, 870.66 and 870.67 do not cover—

(i) articles for acute or transient disability;

(ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled;

(iii) therapeutic and diagnostic articles; or

(iv) medicine or drugs.

102 Stat. 1141–42.

■ The court accepts defendant's assertions that the "loss of teeth does not automatically result in a severe handicap"[8], and that, for some persons, such loss "does not result in substantial limitations of their abili-

---

6. In fact, these written submissions are of such quality as to obviate any need to burden the parties with oral argument, the formal motion for which is thus hereby denied.

7. *See* Pub.L. No. 100–418, § 1121(b) and (f), 102 Stat. at 1138, 1141–42. Section 1121(f) followed the repromulgation of the TSUS by the U.S. International Trade Commission after adoption of the 1982 act in making the "Other" item

(870.67) equal, rather than subordinate, to the articles for the blind encompassed by items 870.65 and 870.66. *Compare* 102 Stat. 1142 *with* 96 Stat. 2347 *and* USITC Pub. 1317, p. 829–2 (2d Supp. April 8, 1983).

8. Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried, para. 22.

ty to speak, work, or engage in customary social functions and interactions"[9], but the court also finds that the *raison d'être* of the Brånemark System® is not that kind of scenario. Rather, in the 1977 book Osseointegrated Implants in the Treatment of the Edentulous Jaw, Professor Brånemark and his co-authors wrote:

Edentulousness entails impaired speech and masticatory ability but it also affects the total psychosocial situation of the patient. The loss of teeth can often be compensated with a denture. In some cases, however, the edentulous individual cannot be adequately rehabilitated with a conventional denture, due to inadequate prosthesis retention caused by pronounced alveolar bone resorption or owing to psychic inability to accept and function with a removable prosthesis. . . .

Plaintiff's Brief, Addendum C, p. 7. Dr. Schumann confirms that the "Brånemark System® ... implants were designed for the treatment of patients who cannot use dentures satisfactorily." Declaration of David Schumann, para. 12. Further:

17. The type of patients who require osseointegrated implants suffer from severe physical impairments. Such patients are referred to in medical literature as "oral invalids."

18. . . . [A] Swedish study published in 1987 . . . found:

"The loss of teeth may constitute a severe handicap. As pointed out by Blomberg (1985), the teeth do not only serve as part of the masticatory system, but, in addition, the oral region is a speech and a psycho-sexual centre. The loss of teeth is equivalent to the loss of an organ with several implications to the individual."

. . . The investigators reported that the patients in the study exhibited significant problems with chewing (and resultant nutrition), speaking, and mental health. . . .

19. Several studies have shown that residual alveolar bone appears to be vulnerable to resorption caused by wearing dentures. The bone responds by an ongoing

and insidious reduction (i.e., loss of bone tissue in the jaw) that is irreversible, ultimately leading to the preclusion of use of dentures. . . . This particularly presents a problem when edentulism occurs in middle-age, leaving many years for continued resorption (loss) of bone.

*Id.,* pp. 5–6 (citations omitted). Dr. Kirk C. Hoerman adds:

3. The loss of all natural teeth—which is known in medical terminology as full edentulism—is a serious contemporary problem of dental health. . . .

4. Generally, edentulous patients are able to adapt to conventional dentures. However, for a substantial number of patients, their conventional dentures are unsatisfactory.

5. Tooth loss constitutes a serious handicap for many of these patients. If not satisfactorily resolved, edentulism substantially impairs the[ir] ability to speak and to chew food properly. . . . [I]t may also give rise to severe psychological problems constraining the patient's ability to engage in customary social functions and interactions. Such patients are often referred to in dental medicine as "oral invalids."

6. Conventional dentures may be unsuitable for treatment of special patients for a variety of reasons. These include (i) anatomical conditions that impair retention of a conventional denture; (ii) risk of damage to alveolar ridges due to functional stress and bone loss caused by conventional dentures; (iii) functional disturbances arising from wearing conventional dentures, such as gagging and nausea; and (iv) psychological inability to accept an ill-fitting denture.

Declaration of Kirk C. Hoerman, p. 2.

In the light of this and the other evidence presented, the court concludes that edentulism renders persons physically or mentally handicapped within the meaning of the foregoing statutory definition. Cf. *U.S. Customs Service Implementation of the Duty–Free Provisions of the Nairobi Protocol, Annex E, to the Florence Agreement* Interpretive Rule,

9. *Id.,* para. 23.

T.D. 92–77, 26 Cust.Bull. 240, 246 (1992) ("what constitutes 'handicapped' under the Nairobi Protocol appears to be very broad and subject to a liberal interpretation").

## B

The defendant submits that,

> even if persons missing all their teeth (or all of the teeth in the upper or lower arch) are handicapped within the meaning of the statute, titanium implants are also used in cases where there are only one or a few teeth missing. Clearly, persons with a minimum of missing teeth are not handicapped within the meaning of the statute. It may be that the titanium implants were initially designed for single tooth replacement, and that they are most prevalently used in single tooth replacement. If this is the case, then titanium implants are clearly not articles for the handicapped.

Defendant's Memorandum, pp. 20–21. But the government has not produced evidence in refutation of plaintiff's proof that the Brånemark System®

> was not designed simply as a method for replacing missing teeth. Rather, it was designed as a reconstructive procedure for edentulous patients who could not satisfactorily wear dentures.

Declaration of David Schumann, para. 6. While the defendant may postulate potential uses of the merchandise, the evidence at hand supports a finding that it is specially designed and manufactured for use in the Brånemark System® procedure. *See* Declarations of David Schumann and Kirk C. Hoerman *passim.*

## C

■ The defendant argues that the merchandise is not entitled to entry duty-free because of the exceptions to item 870.67, *supra,* for (ii) dentures and cosmetic articles for individuals not substantially disabled and for (iii) therapeutic articles.

**10.** Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Fact To Be Tried, para. 20.

### (1)

As to the latter, curing or healing is the standard upon which the courts in *Richards Medical Co. v. United States,* 13 CIT 519, 720 F.Supp. 998 (1989), *aff'd,* 910 F.2d 828 (Fed.Cir.1990), and *Travenol Laboratories, Inc. v. United States,* 17 CIT 69, 813 F.Supp. 840 (1993), relied to determine therapeutic under TSUS. The defendant contends that plaintiff's merchandise is therapeutic in that "[t]here are many causes for the loss of the natural teeth ... and ... [t]he subject merchandise is a cure for all these causes as it provides a permanent replacement for the tooth that is missing." Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue To Be Tried, para. 32.

There is no support on the record for this stance. What is shown, and the court so finds, is that the Brånemark System® neither cures nor treats the underlying causes of edentulism. Rather, the procedure merely enables persons suffering from such condition to chew and speak more normally by providing an anchor for a dental prosthesis. *See* Declaration of Kirk C. Hoerman, para. 14. The court cannot and therefore does not hold this approach to be therapeutic, as defined above.

### (2)

■ With regard to the claim that the imported goods "may be merely cosmetic, such as filling a gap left by a missing tooth" [10], or, if not "purely cosmetic articles, they do have a cosmetic function" [11], suffice it to state that the court cannot conclude that they are "cosmetic article[s] for individuals not substantially disabled" within the meaning of the above exception to item 870.67. On the contrary, the court concludes that persons who suffer edentulism are physically or mentally handicapped to a greater degree than contemplated by the exception. Moreover, while a cosmetic benefit may derive from the Brånemark System®, its primary purpose is permanent implantation in the bones from which normal eating and speak-

**11.** *Id.,* para. 31.

**1500**

ing functions emanate, predominantly a medical, not cosmetic, objective.

### (3)

■ Lastly, the defendant argues that the implants, being "part" of a denture, are not entitled to duty-free treatment pursuant to item 870.67:

> The imported merchandise is an integral constituent of replacement teeth or a dental prosthesis.... [It] is essential to using replacement teeth or dental prosthesis for the patients who require its use. [ ] Indeed, replacement teeth or a dental prosthesis could not be used without the imported merchandise.... Thus, the imported merchandise meets the tariff requirements for a "part." ...
>
> As item 870.67, TSUS, does not specifically provide for parts, the imported merchandise, as a matter of law, can not be classified under that provision....
>
> The imported merchandise is also excluded from classification under Nobelpharma's claimed provision, as a matter of law, for another reason; as headnote 4(b)(ii), TSUS, excludes dentures, it must also exclude parts of dentures....

Defendant's Memorandum, pp. 19–20 (citations omitted).

The plaintiff counters that "the implants support the prosthesis, and the prosthesis replaces the natural teeth." Plaintiff's Reply Brief, p. 8. It relies on the definition of "part" for tariff purposes developed in *United States v. Willoughby Camera Stores, Inc.,* 21 C.C.P.A. 322, T.D. 46851, 1933 WL 1887 (1933), *cert. denied,* 292 U.S. 640, 54 S.Ct. 773, 78 L.Ed. 1492 (1934), and recently cited in *E.M. Chemicals v. United States,* 920 F.2d 910, 913–14 (Fed.Cir.1990). In *Willoughby,* the court held that a tripod is not a part of a camera upon the rationale that

> a "part" of an article is something necessary to the completion of that article. It is an integral, constituent, or component part, without which the article to which it is to be joined, could not *function as such article.*...

The mere fact that two articles are designed and constructed to be used together[ ] does not necessarily make either a part of the other....

> \*     \*     \*

> ... Whether separate or joined, each is complete in itself, each is a distinct and separate commercial entity....

21 C.C.P.A. at 324, 325 (emphasis in original). "More simply stated, 'an element which is not essential to the operation of an article for its intended purpose is not [a] part of [that] article.'" *Auto–Ordnance Corp. v. United States,* 822 F.2d 1566, 1570 (Fed.Cir.1987), quoting *United States v. Cody Manufacturing Co.,* 44 C.C.P.A. 67, 72, C.A.D. 639, 1957 WL 8280 (1957) *But cf. Trans Atlantic Co. v. United States,* 48 C.C.P.A. 30, 33, C.A.D. 758, 1960 WL 8476 (1960) (a device may be "part" of an article even though its use is optional and the article will function without it, if the device is dedicated irrevocably for use with the article, and, once installed, the article cannot be used without it).

A denture is defined as "a set of teeth ... used to designate an artificial or prosthetic replacement for missing natural teeth and adjacent tissues." Dorland's Illustrated Medical Dictionary 446 (27th ed. 1988). There is no indication in any of the commonly used medical dictionaries or in evidence submitted by the defendant that the imported implants are an "integral, constituent, or component part" of a denture. It is true, of course, that the final intended result of the reconstructive surgery is the attachment of artificial teeth. However, to repeat what the court in *Willoughby* held, the mere fact that two articles are designed and constructed to be used together does not necessarily make either a part of the other. 21 C.C.P.A. at 324. And this court finds that the implants and the dentures perform separate functions without loss of any of their essential characteristics. *See id.* at 325. The implants, through the process of osseointegration, serve as an anchor to which the dental prosthesis can be attached, thereby supplanting natural gums and teeth and enabling the bearer to chew and to speak. The imported merchandise and the dentures maintain their distinct, essential characteristics even though they ultimately are brought together.

 

Moreover, TSUS General Interpretative Rule 10(ij) provided that a tariff provision for "parts" of a named class of articles applied to those products "chiefly used" as parts of such articles. As the defendant points out, no such provision covers the tariff section in question:

> ... The ... tariff provisions here do not involve a competition between a parts provision and a specific *eo nomine* provision. Rather, the issue here is whether the merchandise is covered by item 870.67, TSUS, or is not covered by it, because this provision does *not* provide for parts of articles.

Defendant's Reply at 4–5 (emphasis in original). Thus, it is irrelevant whether the implants are in fact "parts", but, in any event, the court concludes that they are not inextricably an element of a denture for purposes of classification. Furthermore, as is true for the exception for cosmetic articles, the denture exception applies to "persons not substantially disabled". Again, that disqualification is not at bar, where the court has concluded that persons who suffer edentulism are indeed substantially disabled.

### III

In light of the foregoing, defendant's motion for summary judgment cannot be granted, while plaintiff's motions to amend the complaint and for summary judgment can be. Judgment will enter accordingly.

So ordered.

### *JUDGMENT*

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that defendant's motion for summary judgment be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DECREED that plaintiff's motion for summary judgment be, and it hereby is, granted; and it is further hereby

ORDERED, ADJUDGED and DECREED that plaintiff's merchandise is cor-

rectly classified under item 870.67 of the Tariff Schedules of the United States (1988); and it is further hereby

ORDERED that the United States Customs Service reliquidate the entries which are the basis of this case under the aforesaid TSUS item and refund to the plaintiff any duties paid, together with interest thereon as provided by law.